Jeffrey L. Haberman (FL Bar 98522) (*pro hac vice*)
jhaberman@schlesingerlaw.com
**SCHLESINGER LAW OFFICES, P.A.**
1212 Southeast Third Avenue
Ft. Lauderdale, FL 33316
Tel: (954) 467-8800
Fax: (954) 320-9509

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| *Philip Glassman v. Monsanto Company*, 3:20-cv-00024-VC | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. SOLOMON HAMBURG AND FOR SUMMARY JUDGMENT** |
| *Deborah Iona v. Monsanto Company*, 3:20-cv-02404-VC | |
| *Sharon Berenfeld v. Monsanto Company*, 3:18-cv-01428-VC | **HEARING DATE: NOVEMBER 1, 2024 AT 10:00AM** |
| *Mark Proctor v. Monsanto Company*, 3:21-cv-00172-VC | |
| *Jean Belfleur v. Monsanto Company*, 3:20-cv-00621-VC | |
| *Matthew Thompson v. Monsanto Company*, 3:20-cv-08851-VC | |
| *Christopher Holmes v. Monsanto Company*, 3:20-cv-03363-VC | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 3

BACKGROUND ............................................................................................................. 5

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 8

A.   DR.   HAMBURG'S   CASE   SPECIFIC   CAUSATION   OPINIONS   ARE
RELIABLE AND ADMISSIBLE ................................................................................. 8

   i.   Dr. Hamburg Reliably Rules In Glyphosate As A Cause of Non-Hodgkin's
Lymphoma ....................................................................................................................... 8

   ii.   Dr. Hamburg's Exposure Days Analysis Is Appropriate ................................... 9

   iii.   Dr. Hamburg Sufficiently Considered Each Plaintiff's Exposure to Roundup to
Establish Causation ....................................................................................................... 10

   iv.   Dr. Hamburg Reliably Rules Out Potential Alternative Causes of Non-Hodgkin's
Lymphoma ..................................................................................................................... 12

   v.   Dr. Hamburg Adequately Considers Naturally-Occurring Mutations As A Cause
of NHL ........................................................................................................................... 22

1

## TABLE OF AUTHORITIES

2

**RULES**

3

Fed. R. Civ. P. 7

4

Fed. R. Evid. 702

5

**CASELAW**

6

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594 (1993)

7

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999)

8

Lust By and Through Lust v. Merrell Dow Pharma., Inc., 89 F.3d 594, 597 (9th Cir. 1996)

9

United States v. Hankey, 203 F.3d 1160, 1167 (9th Cir. 2000)

10

Clausen v. M/V New Carissa, 339 F.3d 1049, 1057 (9th Cir. 2003)

11

Primiano v. Cook, 598 F.3d 558, 563-64 (9th Cir. 2010)

12

Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1198 (9th Cir. 2014)

13

Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1234 (9th Cir. 2017)

14

Hardeman v. Monsanto Company, 997 F.3d 941, 966 (9th Cir. 2021)

15

Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 782 (7th Cir. 2017)

16

Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc., 892 F.3d 624, 639 (4th Cir. 2018)

17

United States v. W.R. Grace, 455 F. Supp. 2d 1181, 1188 (D. Mont. 2006)

18

Emblaze Ltd. v. Apple Inc., 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014)

19

In re E.I. du Pont, 342 F.Supp.3d 773, 785 (S.D. Ohio 2016)

20

In re Roundup Products Liability Litigation, 358 F. Supp.3d 956, 961 (N.D. Cal. 2019)

21

In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig., 2020 WL 204115

22

(N.D. Cal. Jan. 13, 2020)

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Monsanto Company's ("Monsanto") Motion to Exclude Testimony of Dr. Solomon Hamburg, M.D., Ph.D. ("Dr. Hamburg") is based on a distorted, incomplete characterization of his opinions and a misreading of the applicable law. As an initial matter, Monsanto has moved to exclude all of Dr. Hamburg's opinions offered in the Roundup Products Liability Litigation ("Roundup MDL") based on a piecemealed compilation of his testimony in seven (7) individual cases—all of which have distinct facts and circumstances. Under the Federal Rules of Civil Procedure, motions must be tailored to the specific circumstances and needs of *each* case. Fed. R. Civ. P. 7(b)(1)(B). Yet, Monsanto has failed to set forth specific grounds for exclusion of Dr. Hamburg's opinions in each individual case. On the basis of form alone, Monsanto's Motion to Exclude is entirely improper and should be denied; nonetheless, it equally lacks in merit. Monsanto seeks to exclude Dr. Hamburg under Fed. R. Evid. 702 and Daubert. In doing so, however, Monsanto recycles many of the same arguments the Ninth Circuit and this Court have already rejected in the Roundup MDL.

*First*, Monsanto argues that Dr. Hamburg failed to effectively "rule in" Roundup as a potential cause of each Plaintiff's Non-Hodgkin's Lymphoma ("NHL") by relying on "cherry-picked epidemiological data as a substitute for dose." Mot. at 1. However, as Monsanto is acutely aware, this Court has rejected this very argument, asserting that "a specific causation expert's "ruling in" process does not require a full, independent general causation analysis." PTO 290 at 6. Dr. Hamburg—like several other case specific experts in the Roundup MDL—properly "rules in" glyphosate by incorporating and relying on the general causation opinions of other duly admitted experts in this litigation.[1] Id.

*Next*, Monsanto criticizes the reliability of Dr. Hamburg's exposure analysis on the basis that he failed to quantify or estimate each Plaintiff's exposure "dose" of Roundup, and relied solely on the Plaintiff's deposition testimony and/or Plaintiff Fact Sheet. Mot.

---

[1] Plaintiffs no longer seek to offer Dr. Hamburg's general causation opinions in any of the underlying seven (7) cases.

at 1. But as clearly stated by this Court, exposure days—when considered in conjunction with other information about the Plaintiff's exposure such as the type of protective equipment the Plaintiff used and whether they remembered inhaling Roundup or getting it on their skin—"is not an inherently unreliable metric." PTO 290 at 5. Dr. Hamburg's use of an exposure day analysis, along with information collected from the Plaintiff's own testimony, is an entirely appropriate methodology for determining exposure.

*Lastly*, contrary to Monsanto's assertions, Dr. Hamburg utilized a differential diagnosis in forming his specific causation opinions in each case, a methodology that is presumptively admissible under the applicable Daubert analysis. Dr. Hamburg considered numerous alternative causes of each Plaintiff's NHL in the course of conducting the differential diagnosis, and there was no oversights in his analyses that render his conclusions unreliable.

Dr. Hamburg's validated methodology, in addition to his over forty (40) years of training, research, and experience as an oncologist and hematologist, render his opinions reliable and admissible. For these reasons and those more fully set forth herein, Monsanto's Motion to Exclude should be denied.

## BACKGROUND

Dr. Hamburg is a triple board-certified oncologist and hematologist currently serving as Clinical Professor of Medicine in the Division of Hematology-Oncology at UCLA's David Geffen School of Medicine—one of the premier research and educational institutions in the country. See Ex. A; Dr. Hamburg's CV. Prior to starting his current role in 2017, Dr. Hamburg served as an oncology consultant in the Liver Transplant Program at Cedars-Sinai, and as a partner in the Hematology-Oncology Medical Group at Cedars-Sinai for over twenty (20) years. Id.

Dr. Hamburg earned all three (3) of his degrees at New York University in New York, New York, graduating with an M.S. in Basic Medical Sciences in 1978, and a Ph.D. in Basic Medical Sciences as well as an M.D. in 1981. Id. He then completed an internship

and residency in Internal Medicine at the New York Hospital Cornell Medical Center from 1981 to 1984. Id. He also completed a subspeciality fellowship in Hematology and Oncology at UCLA's Center for Health Sciences in Los Angeles, California from 1984 until 1987, at which time he also served as an attending physician at the Olympia Medical Center in Los Angeles, California. Id. He is board-certified by the American Board of Internal Medicine in Internal Medicine (1984), Medical Oncology (1987), and Hematology (1988). Id.

In addition to his over forty (40) years of experience as a clinical oncologist diagnosing and treating thousands of patients with cancer, Dr. Hamburg has also served as a member of the Carcinogen Identification Committee and Scientific Advisory Board of the Office of Environmental Health Hazard Assessment of the State of California—a committee of expert scientists appointed by the Governor to identify chemicals that have been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer. Id.

## LEGAL STANDARD

Fed. R. Evid. 702 controls the admission of expert testimony. Rule 702 provides that a qualified expert may testify in the form of opinions or otherwise if:

a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b) The testimony is based on sufficient facts or data;

c) The testimony is the product of reliable principles and methods; and

d) The expert has reliably applied the principles and methods to the facts of the case.

In the landmark Daubert case, the Supreme Court instructed that that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594 (1993). In determining admissibility, courts consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Primiano v. Cook, 598 F.3d 558, 563–64 (9th Cir. 2010).

The four Daubert factors—testing; peer review; rate of error; and general acceptance—are mere guidelines for applying Rule 702. See United States v. Hankey, 203 F.3d 1160, 1167 (9th Cir. 2000); see also Lust By and Through Lust v. Merrell Dow Pharma., Inc., 89 F.3d 594, 597 (9th Cir. 1996) ("That the expert failed to subject his method to peer-review and to develop his opinion outside the litigation is not dispositive . . . ."); In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig., 2020 WL 204115, at *5 (N.D. Cal. Jan. 13, 2020) ("[E]xpert testimony may still be reliable and admissible without peer review and publication.").

Indeed, the test of reliability is also flexible. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). "The trial court's gatekeeper role, however, is not meant to supplant the adversary system or the role of the jury." United States v. W.R. Grace, 455 F. Supp. 2d 1181, 1188 (D. Mont. 2006). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

A trial court thus must be sure that its review of expert testimony focuses solely on principles and methodology, not on the conclusions that they generate. Daubert and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness. A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder. Emblaze Ltd. v. Apple Inc., 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (internal

quotations omitted); see also <u>Primiano</u>, 598 F.3d at 565.

Monsanto asserts that Rule 702 has recently been revised to "empower the Court to exclude the shaky testimony of plaintiff's experts that it may have felt compelled to admit under the now-obsolete Ninth Circuit presumption favoring expert admissibility." Mot. at 1. But there has been no change, substantive or otherwise, to Rule 702. In actuality, the 2023 amendments to Rule 702 seek only to "clarify and emphasize" that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in Rule 702. See 2023 Amendments, Fed. R. Evid. 702. The committee notes that "[n]othing in the amendment imposes any new, specific procedures… the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert testimony under Rule 702**.**" (emphasis added).

Since its amendment in 2000 incorporating the Daubert standard, Rule 702 has always been governed by the principles of Rule 104(a) with respect to the admissibility of expert testimony. See <u>Gopalratnam v. Hewlett-Packard Co.</u>, 877 F.3d 771, 782 (7th Cir. 2017). Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. Simply put, Defendants argument for the application of the "newly heightened" Rule 702 standard is not only misleading but ignores twenty-four (24) years of well-established law.

<u>**ARGUMENT**</u>

**A.    DR. HAMBURG'S CASE SPECIFIC CAUSATION OPINIONS ARE RELIABLE AND ADMISSIBLE**

**i.    Dr. Hamburg Reliably Rules In Glyphosate As A Cause of Non-Hodgkin's Lymphoma**

It is well settled within this litigation that specific causation experts can "rule in" glyphosate as a cause of NHL without conducting a full, independent causation analysis, by incorporating and relying on the general causation opinions of other duly admitted

experts. See PTO 85 & 290. Yet, relying on the very same arguments previously rejected by this Court, Monsanto argues that Dr. Hamburg did not adequately rule in glyphosate as a possible cause of each Plaintiff's NHL because he "outright ignores extensive epidemiology that shows no increased risk or no dose response for NHL due to glyphosate exposure." Mot. at 5-6. To this point, the Court's Pretrial Order Nos. 85 and 290 are instructive. See PTO 85 at 3-4 ("Monsanto's primary criticism of the ruling in process – namely, that the specific causation experts improperly ruled in glyphosate exposure by cherry-picking favorable epidemiological studies – is off point…the specific causation experts are permitted to build from the plaintiffs' admissible causation opinions… it does not matter that the specific causation experts mentioned only a subset of the epidemiological studies in their reports…"); see also PTO 290 at 6 ("The point is not that cherry-picking is acceptable; the point is just that a specific causation experts "ruling-in" process does not require a full, independent general causation analysis.").

As properly set forth in each of his expert reports, Dr. Hamburg incorporates the admissible general causation opinions of Beate Ritz, Ph.D., Christopher Portier, Ph.D., and Dennis Weisenburger, M.D., to determine whether Roundup caused each specific Plaintiff's NHL. In doing so, Dr. Hamburg does not "ignore" the epidemiology surrounding glyphosate and NHL, but rather relies on and adopts the opinions of those experts who analyzed the full body of epidemiological evidence and determined that glyphosate does indeed cause NHL. This is entirely proper.

### ii.    Dr. Hamburg's Exposure Days Analysis Is Appropriate

In further criticism of Dr. Hamburg's methodology, Monsanto argues that his threshold analysis is inadequate because it is based solely on the McDuffie (2001) study. Mot. at 6. As a threshold matter, this is blatantly false, as Dr. Hamburg also relies on the Eriksson study. See also Ex. B; Iona Depo. 78:20-24; 79:3-5 ("Q: So McDuffie is the only study you're relying on for your opinion that all it needed is two days of exposure to

increase the risk of NHL, right? A: No… I'm relying on all of the studies to help me believe that, in fact, two days per year is adequate."). Even so, there is no support for Monsanto's argument. See <u>Hardeman v. Monsanto Company</u>, 997 F.3d 941, 966 (9th Cir. 2021) (rejecting Monsanto's argument that Hardeman's specific causation experts had relied on "two flawed studies"—McDuffie and Eriksson—linking glyphosate to NHL, and holding that the experts had properly been allowed to rely on these studies to show a dose-response relationship between glyphosate and NHL). The fact that the exposure day analysis does not adjust for other exposures does not in it of itself render it inadmissible under Daubert. Indeed, "the metrics limitations can be brought out on cross examination and made clear to the factfinder." PTO 290 at 5. Finally, the fact that "Dr. Hamburg has never determined whether a particular agent caused a person's NHL based on the number of days of exposure" bears absolutely no relation to the limitations of the exposure days metric. This point is misplaced.

### iii.   Dr. Hamburg Sufficiently Considered Each Plaintiff's Exposure to Roundup to Establish Causation

Monsanto also argues that Dr. Hamburg's specific causation opinions are unreliable because he does not calculate "dose"—i.e. the precise amount of Roundup that entered each Plaintiff's bodies. Mot. at 7. However, "dose" is not the standard for reliability. Indeed, no Roundup Court has ruled that a medical oncologist offering a specific causation opinion needs to calculate a Plaintiff's *actual absorbed dose* of glyphosate to conduct a differential diagnosis. To the contrary, exposure days—when considered in conjunction with other information about the Plaintiff's exposure such as the type of protective equipment the Plaintiff used and whether they remembered inhaling Roundup or getting it on their skin—is sufficient to establish causation. PTO 290 at 5. Similarly, this Court held in PTO 85 that the specific causation experts noted the "plaintiffs' exposure levels in drawing their conclusions. All three experts noted the plaintiffs' extensive Roundup usage,

and further explained – as did the plaintiffs' general causation opinions – that both the McDuffie (2001) and Eriksson (2008) studies showed a dose-response relationship between glyphosate...Thus, consistent with Ninth Circuit caselaw, the experts provided a basis for their conclusion that these plaintiffs fall into the category of Roundup users who developed NHL." PTO 85 at 6; see also Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc., 892 F.3d 624, 639 (4th Cir. 2018) ("Nevertheless, we recognized that 'only rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes,' and that it is often 'difficult, if not impossible, to quantify the amount of exposure.'" "Thus, in Westberry, it was sufficient for the plaintiff to introduce evidence of 'substantial exposure'").

Like other case specific causation experts in the Roundup MDL, Dr. Hamburg considered the totality of the circumstances for each individual Plaintiff's Roundup use and exposure as part of his exposure days analysis, including the locations and frequency of each Plaintiff's Roundup use and the type of protective gear they wore, if any, to conclude that Roundup was a substantial cause of their NHL.

Dr. Hamburg's expert reports and full deposition transcripts discredit Monsanto's attempts to cast doubt on the reliability of Dr. Hamburg's opinions. For example, Monsanto represents that Dr. Hamburg "is not aware of any test confirming that Ms. Iona had glyphosate in her body." Mot. at 7. But in reality, no such test is available. See Ex. B; Iona Depo. 82:25; 83:1-17 ("Q: You can't point to any test at any time that would confirm that Ms. Iona had any measurable level of glyphosate in her body, right? A: I – I am not aware that there are laboratories that will measure glyphosate outside of a research setting. Q: Okay. You don't know, sitting her today, whether Ms. Iona could order a laboratory test to show whether or not she has glyphosate in her system; is that right? A: I know that I cannot… [a]nd I'm at one of the major medical centers in the country."). Monsanto also asserts that Dr. Hamburg "admitted that he was unaware of whether Mr. Holmes testified

that he spilled Roundup on his skin…". Mot. at 7. But this entirely mischaracterizes Dr. Hamburg's testimony regarding Mr. Holmes' dermal exposure to Roundup. See Ex. C; Holmes Depo. 41:6-11 (Q: How do you know that Plaintiff had dermal exposure to Roundup? A: Again, he was not in a in a – a hazmat suit, so if you're spraying it, you're going to get dermal exposure from use." The fact that Dr. Hamburg could not recall—from memory alone—every part of Mr. Holmes' deposition testimony hardly bears relation to his exposure analysis in this case. The same rings true of Dr. Hamburg's testimony that he was "unaware of whether Mr. Thompson washed his hands, showered, or washed his clothing after applying Roundup." Dr. Hamburg's expert report indicates the frequency and nature of Mr. Thompson's Roundup use, including the clothing he wore and lack of protective gear. See Ex. D; Thompson Report at 3 ("I am relying on Mr. Thompson's Plaintiff Fact Sheet and Mrs. Thompson's affidavit regarding Mr. Thompson's Roundup use and exposure. According to the aforementioned, Mr. Thompson began spraying Roundup weed and grass killer in 1998 for residential use…From 1998 to 2005, Mr. Thompson used Roundup on and around the Florida Residence at least two (2) times per month, for approximately thirty (30) minutes each use. He wore a t-shirt and shorts while spraying and did not wear any protective gear.")

Each of Dr. Hamburg's reports is replete with specific details about the Plaintiff's exposure and usage of Roundup, including the type of protective clothing or equipment they wore, their dermal or inhalational exposure to Roundup, the locations they sprayed Roundup, and the types and quantities of Roundup they purchased. This is an entirely appropriate methodology for determining exposure.

### iv.    Dr. Hamburg Reliably Rules Out Potential Alternative Causes of Non-Hodgkin's Lymphoma

Monsanto further errs in suggesting that Dr. Hamburg's opinions are unreliable because he "ignores several plausible causes of Plaintiffs' NHL disease." Mot. at 8. Dr.

Hamburg's specific causation opinions are based on a robust differential diagnosis, and each of his reports explain in detail his differential etiology, including his basis for ruling out recognized risk factors for the development of NHL and other environmental exposures.

A differential diagnosis is presumptively admissible under the applicable Daubert analysis. See Clausen v. M/V New Carissa, 339 F.3d 1049, 1057 (9th Cir. 2003) ("[d]ifferential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under Daubert."). A differential diagnosis is simply a framework for identifying the most probable cause of a disease. See Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1234 (9th Cir. 2017). Moreover, the Ninth Circuit has made clear that an expert physician may testify as to the cause of injury based solely on his experience and review of the medical records. See Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1198 (9th Cir. 2014); Sementilli v. Trinidad Corp., No. 96-16034 (9th Cir. Sept. 16, 1998), as amended Nov. 12, 1998 (per curiam) ("This court, after Daubert, has held that a medical doctor's testimony regarding the cause of an injury may be based on experience and review of medical records only.") (emphasis added).

Certainly, Dr. Hamburg's forty (40) plus years of experience as an oncologist and hematologist (with a particular focus on blood cancers such as NHL), in addition to his review of each Plaintiff's medical records and testimony regarding their Roundup use and exposure, renders him qualified to opine on the specific cause of injury in these cases. As does Dr. Hamburg's experience as a member of the Carcinogen Identification Committee and Scientific Advisory Board of the Office of Environmental Health Hazard Assessment of the State of California, wherein his role included identifying chemicals that have been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer—much like his role in the underlying cases.

Monsanto endeavors to highlight Dr. Hamburg's "flawed reasoning and analysis" by manufacturing various soundbites from Dr. Hamburg's depositions to distort his opinions. But a review of Dr. Hamburg's complete testimony is evidence to the contrary.

*Iona*: Monsanto argues that Dr. Hamburg "failed to meaningfully consider Ms. Iona's age, ethnicity, and her 35 year smoking history." Mot. at 8. Notably, however, their motion is silent as to the ways in which Dr. Hamburg failed to adequately consider both age and ethnicity. Nonetheless, risk factors such as advanced age are associated with an increased likelihood of developing non-Hodgkin's lymphoma "but are not likely causative." See Ex. E; Iona Report at 14. And what's more, is that Monsanto themselves note the "great lengths" that Dr. Hamburg went to "rule out" smoking as a potential cause of her NHL. Id; see also Ex. B; Iona Depo. at 9:3-4("[I] reviewed a number of articles concerning smoking and non-Hodgkin's lymphoma…"). To this point, Dr. Hamburg's expert report notes the following:

> "While evidence exists to support an association between tobacco smoking and non-Hodgkin's lymphoma, the degree of association varies dependent on smoking intensity. A 2017 case-control study derived from data ranging from 1999 to 2014 found that individuals smoking 15 or more cigarettes per day showed an increased risk of non-Hodgkin's lymphoma, and that the risk was particularly elevated for follicular non-Hodgkin's lymphoma. However, for former smokers or individuals smoking less than 15 cigarettes a day, no excess risk emerged. Ms. Iona quit smoking tobacco in 2019. Further, medical records reflect that she smoked much less than 15 cigarettes per day. She has never used any other type of smokeless tobacco or other tobacco products."

Ex. E; Iona Report at 16.

Consistent with his report, Dr. Hamburg testified that he considered Ms. Iona's cigarette smoking as a potential cause of her NHL. See Ex. B; Iona Depo. at 48:23-25; 49:1-2, 5-7 ("And, so, I would say that glyphosate, Roundup, is a risk factor, as well as cigarette smoking is a risk factor, and that they – they together probably contributed to the cause…[s]o there are other risk factors that she has, but certainty Roundup is a significant

14

risk factor as well.").

In similar vein, Dr. Hamburg thoroughly distinguishes the relative risks associated with Ms. Iona's lupus diagnosis from her exposure to glyphosate in Roundup. See Ex. B; Iona Depo. 133:17-24; 134:1-8 ("Q: And does your report also contain bases for how you went about weighing the association here for Ms. Iona of her lupus and her cigarette use history? A: I – I considered them all. As I say, autoimmune illnesses are associated with non-Hodgkin's lymphoma, but not as causative, more as a correlative issue."). In any event, Dr. Hamburg notes that the relationship between SL (i.e. lupus) and NHL is bidirectional. See Ex. E; Iona Report at 14-15 ("A study examining the characteristics of patients with SL and NHL noted that the mean duration of SLE at NHL diagnoses was 17.8 years. This suggests a rather long latency and chronic immunosuppressed state is associated with NHL. Here, however, Ms. Iona only had lupus for about 4 years before her NHL diagnosis, which suggests she did not have such a sustained period of immunosuppression or inflammation. In addition, literature also describes the relationship between lupus and NHL as bidirectional.").

With respect to Dr. Hamburg's consideration of Ms. Iona's family history of hematological malignancy, Ms. Iona testified that other than her father—who had pancreatic cancer—her family medical history is unremarkable for any other illnesses and/or medical conditions. See Ex. F; Deborah Iona Depo. at 183-184. Moreover, the fact that Ms. Iona may have a family history of a hematologic malignancy does not in it of itself mean that she has a predisposition. See Ex. B; Iona Depo. at 69 ("Q: And are you able to rule out Ms. Iona's having a first-degree family history of a hematologic malignancy in the development of her follicular lymphoma? A: I would answer the question that it certainty suggests that she might have a predisposition. But predispositions are not enough to cause a malignancy. Many people have family members with first-degree relatives who have hematological disorders who never come down with non-Hodgkin's lymphoma or – or any

1    other malignancy.").

2        *Berenfeld*: Monsanto attempts to cast doubt on the sufficiency of Dr. Hamburg's

3    analysis by manipulating Dr. Hamburg's testimony regarding Dr. Berenfeld's positive

4    ANA test—which measures markers for autoimmune diseases. To that end, Monsanto

5    argues that "Dr. Hamburg admitted that he did not discuss such literature in his report, and,

6    more importantly, does not have the record of Dr. Berenfeld's ANA test result so he could

7    say if her ANA level fit within that of the literature." Mot at. 10. But Dr. Hamburg further

8    indicates that "he has no reason to assume it was that high" so as to suggest a relationship

9    between the development of NHL. See Ex. G; Berenfeld Depo. at 67:22-25; 68:1.

10    Moreover, as indicated by Monsanto's own expert Dr. Grinblatt, Dr. Berenfeld's records

11    also note various negative ANA test results. See Ex. H; Grinblatt Depo. at 41:19-23. The

12    fact that at different points her ANA results teetered between positive and negative does

13    not suggest that she had a chronic autoimmune disease, but rather, is merely indicative of

14    inflammation at that specific point in time. Indeed, Dr. Berenfeld's own treating physicians

15    did not diagnose her with an autoimmune disease at the time of her positive ANA results.

16

17        Likewise, Monsanto improperly suggests that Dr. Hamburg "does not consider" Dr.

18    Berenfeld's family history of NHL and other cancers. Mot. at 10. See Ex. I; Berenfeld

19    Report at 23 ("Dr. Berenfeld reports that her biological mother was positive for Lynch

20    syndrome. In 2019, Dr. Berenfeld had genetic testing done which revealed that the MSH2

21    gene was negative indicating that she is not at an increased genetic risk for cancers

22    associated with Lynch syndrome. Her medical records further indicate no concern of

23    genetic concern based on her personal and family history. Moreover, her family history is

24    unremarkable for malignancies of the blood or bone marrow."). And Dr. Hamburg equally

25    considers Dr. Berenfeld's history of basal cell carcinoma and obesity. See Ex. G; Berenfeld

26    Depo. at 72:12-21 ("Q: But Dr. Berenfeld, she had basal cell skin cancer in 1990; correct?

27    A: Yeah, but what I'm trying to tell you is that the data does not suggest that there is a

28

causative relationship between basal cell cancer and non-Hodgkin's lymphoma. The data just simply says if you've had basal cell cancers, you're at increased risk. Whether that has do with cause or not is probably unlikely, in my opinion."); see also Ex. I; Berenfeld Report at 23 ("Other suggested risk factors of non-Hodgkin's lymphoma such as obesity are not at issue here. Nothing in Ms. Berenfeld's records or testimony indicate significant issues pertaining to her weight/elevated BMI. Despite having decreased mobility as a result of her lower extremity pain, she lives a relatively healthy and balanced lifestyle."). As to Dr. Hamburg's consideration of Dr. Berenfeld's history of Hashimoto's Thyroiditis and human papilloma virus, the fact that autoimmune diseases have been associated with the increased risk of NHL does not invalidate Dr. Hamburg's decision to rule them out as the cause of Dr. Berenfeld's NHL, as she developed both after she was diagnosed with NHL.

*Proctor*: While Monsanto asserts that "Dr. Hamburg's report further fails to consider Mr. Proctor's sister's breast cancer," that is simply not the case. Mot. at 10; see Ex. J; Proctor Depo. at 121:20-22; 122:6-10 ("Q: Are you aware that Mr. Proctor has a biological sister with breast cancer? A: I believe I was, yes…Q: You didn't include that in your report, correct?... A: Yeah, it's in my report that he has a family history."). However, because a family history of breast cancer—unlike that of malignancies of the blood or bone marrow—is not a recognized risk factor of NHL, Dr. Hamburg's appropriately determined that a more in depth analysis was unnecessary to render his opinions. See Ex. K; Proctor Report at 12. This too is the case for Mr. Proctor's history of skin cancer. Id.

*Thompson*: Monsanto criticizes Dr. Hamburg's methodology for considering smoking as a cause or contributor to Mr. Thompson's development of NHL. But Dr. Hamburg clearly sets forth his methodology for doing so. Contrary to Monsanto's representations, Dr. Hamburg admits that smoking can substantially contribute to the risk of developing NHL. See Ex. L; Thompson Depo. at 34:19-25; 35: ("Q: Okay. So can smoking substantially contribute to non-Hodgkin's lymphoma development? A: It is a – I

would say it is a risk factor associated with an increased risk of coming down with non-Hodgkin's lymphoma."). However, based upon his review of relevant data, Mr. Thompson's medical records, and his general knowledge and experience as an oncologist and hematologist, Dr. Hamburg was able to determine that smoking was likely not the cause of Mr. Thompson's NHL. Id. at 37:9-25 ("[A]s I said in my report that [sic] the data that I came across showed that in fact that there is an increased risk of non-Hodgkin's lymphoma in patients who smoked 40 years or more, but not in patients who smoked this amount."); 37:23-25; 38:1 ("The data suggests that it talks about a 40-pack-year history to have a slight increased risk of non-Hodgkin's lymphoma, and he didn't meet that criteria.").

Similarly, Dr. Hamburg relies on his fundamental knowledge of cancer etiology to rule out Mr. Thompson's occupation as an electrician as the cause of his NHL. See Ex. L; Thompson Depo. at 43:4-17 ("Well yes, on the basis of what I said in my report, as well as the fact that he apparently repaired electrical pumps. I don't know if that fits the definition of an electrical fitter or not. And I don't see, from a biological standpoint, how an electrical – electrician would get lymphoma unless there was an exposure to something. So I don't know what an electrical fitter is. If an electrical fitter means that you're – you're making electrical wire and you're dealing with plastics, then I can at least understand that. But I don't understand that somebody repairing pumps can cause non-Hodgkin's lymphoma."). And according to Mrs. Thompson, while Mr. Thompson "did the programming and fixing of pumps" "it was mostly IT and programming." See Ex. M; Jaimie Thompson Depo. at 53:21-22; 54:16-18. As Dr. Hamburg appropriately points out, while gasoline does contain benzene, there is no evidence that suggests that Mr. Thompson was ever exposed to it.

Monsanto further avers that Dr. Hamburg's report "failed to acknowledge that Mr. Thompson's mother had lung cancer." Mot. at 11. This is simply not the case. See Ex. D; Thompson Report at 2 ("[Mr. Thompson's] family history is remarkable for Marfan

syndrome (sister), coronary artery disease (father), bone cancer (maternal grandmother), and lung cancer."). The fact that Dr. Hamburg acknowledges that a family history of lung cancer would increase the risk for *any* type of malignancy, does not suggest that he did not adequately consider this point in forming his opinions. Rather, Dr. Hamburg focused his differential diagnosis on the risk factors generally known to cause or contribute to the development of NHL, which includes "family history of malignancies of the blood or bone marrow." Id. at 8.

Monsanto's final point that Dr. Hamburg did not do a differential diagnosis analysis for Mr. Thompson's pancreatic cancer is entirely misguided. Mr. Thompson was not diagnosed with pancreatic cancer until November 2020, more than nine (9) years *after* his NHL diagnosis.

*Belfleur*: Risk factors, such as advanced age, gender, and obesity, while associated with an increased likelihood of developing NHL, are not likely causative. See Ex. N; Belfleur Report at 14; see also Ex. O; Belfleur Depo. at 61:23-25; 62:1-5 ("Q: You're aware that being overweight or obese is a risk factor for the development of NHL and DLBCL, in particular; correct? A: It's correlative but not causative in that – so there are many correlates for getting sick, and just because there's – there's no mechanistic reason why being minimally obese should lead to non-Hodgkin's lymphoma but there is a correlative relationship, yes."). Nonetheless, these factors are appropriately addressed in Dr. Hamburg's analysis of the cause of Mr. Belfleur's NHL. See Ex. O; Belfleur Depo. at 62:6-12;16-19 ("Q: When you say there's no mechanistic reason for being minimally obese, would there be a mechanistic reason if someone is, say, morbidly obese? A: It is – there are – there are biological things that do happen in the sense of morbid obesity that we're aware of, and that's a chronic inflammatory state…Q: So is it your testimony that having a low – a BMI that's overweight or minimally obese would not cause a chronic inflammatory state? A: That is correct."). As is Mr. Belfleur's medical history of diabetes

and hepatitis B, which, according to his medical records, are unclear as to the existence of either. Id. at 58:22-25 ("Q: Did Mr. Belfleur have diabetes? A: There are a couple of notes that said he did and then there's a couple notes that said he didn't so I – I'm not sure."); 98:8-12 ("Q: Well, we saw that he had a past exposure to hepatitis, based on his laboratory test; correct? A: You can have past exposure to many viruses and never gotten sick with that illness. Hepatitis is an illness.").

Moreover, Dr. Hamburg appropriately considered Mr. Belfleur's personal history of prostate cancer and family history of colon cancer. As previously set forth herein, while having a family history of cancer would increase the risk for any type of malignancy, malignancies of the blood or bone marrow are those generally known to cause or contribute to the development of NHL. Other factors, such as exposure to opioids and a history of smoking, do not bear any meaningful relation to Mr. Belfleur's NHL. Specifically, smoking is only correlative with follicular lymphoma, not DLBCL. With respect to Mr. Belfleur's use of opioids, first, it is unclear exactly when Mr. Belfleur began using opiates and/or for how long. In any event, the types of opioids he used—Ultram and Tramadol— are both opioid derivates with very low potency. See Ex. O; Belfleur Depo. at 56:3-18. Relying on his over forty (40) years of clinical experience treating patients with various blood cancers, Dr. Hamburg contests an association between opioids and NHL. Id. at 56:24-25; 57:1-5. In fact, Dr. Hamburg "use[s] opiates on a regular basis for his patients and [has] been using opiates for over 40 years, and [sees] no increased risk of non-Hodgkin's lymphoma in [his] experience." Id.

*Glassman*: Monsanto's claim that Dr. Hamburg "failed to give consideration to Mr. Glassman's weight" because he "was unaware whether Mr. Glassman had a BMI over 25 and made no attempt to calculate his BMI despite having his medical records" is entirely meritless. Mot. at 13. As a threshold matter, Monsanto's own expert, Dr. Van Etten, performs no such calculation. But what's more, is that Monsanto offers zero support for

the contention that Mr. Glassman was overweight. Indeed, other than a single record which notes that Mr. Glassman had a slightly above normal BMI of 26, there is no evidence to suggest that he was ever overweight. Still, Dr. Hamburg "considered whether or not Mr. Glassman had a history of obesity" but "didn't see any history of obesity" in Mr. Glassman's medical records. See Ex. P; Glassman Depo. at 388:9-12.

*Holmes*: In a broad-brushed attempt to challenge Dr. Hamburg's opinions in the Holmes matter, Monsanto argues that Dr. Hamburg "failed to meaningfully consider Mr. Holmes' age, gender, weight, and medical history" without any support for such contention. Mot. at 13. But a mere review of Dr. Hamburg's report, which, among other things, includes a summary of Mr. Holmes' medical history and chronology of relevant medical events and treatment from 2014 to 2022, proves otherwise. See Ex. Q; Holmes Report at 3-5. Monsanto further avers that Dr. Hamburg failed to give due consideration to Mr. Holmes' "chronic hepatitis B as a potential cause of his NHL ." Mot. at 13. However, the simple fact that Dr. Hamburg disagrees with data presented to him by Monsanto does not suggest that his analysis is insufficient. Here, after reviewing the study presented to him at deposition, Dr. Hamburg testified that "he is not aware of any convincing data that hepatitis B is a cause of non-Hodgkin's lymphoma" as "most of the data comes out of Asia and most of those are difficult to interpret in terms of – in light of the fact that the majority of the population has hepatitis B positivity." See Ex. C; Holmes Depo. at 54:2-7.

Next, in what appears to be a challenge to Dr. Hamburg's exposure analysis, Monsanto notes the four-year period (from 2014 to 2017) that Mr. Holmes was in prison and therefore not using Roundup. Yet, this lapse in Roundup use is insignificant, as Mr. Holmes still used Roundup for a total of thirty-two (32) years. See Ex. Q; Holmes Report at 5.

Lastly, Monsanto challenges Dr. Hamburg's analysis of Mr. Holmes' exposure to other possible carcinogens as part of his occupation as an airline pilot, including the

benzene in jet fuel, ionizing radiation, and chemicals in fire extinguisher spray. Mot. at 14. Still, there is no evidence to suggest that Mr. Holmes was ever actually exposed to these chemicals, or that there is an association with NHL. See Ex. C; Holmes Depo. at 60:9-22 ("A: Occupational exposures are associated with airline pilots because of the altitude and the exposure to exit radiation…Q: So those are potential risk factors for cancer for Mr. Holmes? A: Cancer, I'm not – I am unaware that there's any association between that and non-Hodgkin's lymphoma…"Q: Mr. Holmes testified that he worked around jet flue during his job as an airline pilot, correct? A: Yes.").

Dr. Hamburg reliably concludes that each Plaintiffs' Roundup exposure was a substantial factor in causing or contributing to cause each Plaintiffs' NHL.

### v.    Dr. Hamburg Adequately Considers Naturally-Occurring Mutations As A Cause of NHL

In a final attempt to manipulate Dr. Hamburg's opinions, Monsanto avers that Dr. Hamburg "ignores" other causes that are responsible for most NHL cases "including naturally-occurring mutations." Mot. at 14. This assertion is fallible.

First, it is important to note that the majority of Monsanto's experts point to "naturally-occurring mutations" as the cause of each Plaintiff's NHL. And to this point, Monsanto's own expert, Dr. Weiss, concedes that random replication—i.e. naturally-occurring mutations—is the same as idiopathic. See Ex. R; Weiss Depo. at 20:21-25 ("Q: If someone says that – you know, or discusses cancer as being idiopathic, is that synonymous with saying that cancer is a result of random replicative error? A: Yes."). Differential etiologies are appropriate even when there is a high rate of unknown causes (idiopathic) for a disease and where the expert cannot completely rule out idiopathic causes. Idiopathic means that there is no *known* cause—not that there is *no* cause. The fact that a cause is not identified in most cases does not mean a cause cannot be identified in any cases. In re E.I. du Pont, 342 F.Supp.3d 773, 785 (S.D. Ohio 2016) ("while Dr.

Bahnson recognized that the majority of cases of testicular cancer are of unknown origin, in 15% of his patients he can determine a cause of the testicular cancer."). "It is enough that the proposed cause 'be a substantial causative factor.' This is true in patients with multiple risk factors, and analogously, in cases where there is a high rate of idiopathy." Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1237 (9th Cir. 2017).

Relying on the opinions of Plaintiffs' general causation experts that glyphosate is a probable carcinogen with exposure causing an increased risk of NHL, and his differential etiology, including his basis for ruling out recognized risk factors for the development of NHL and other environmental exposures, Dr. Hamburg concludes that Roundup was the likely cause of each of Plaintiff's NHL. Indeed, Dr. Hamburg dedicates an entire section of his reports to considering—and ultimately ruling out—alternative explanations to each Plaintiff's NHL.

Accordingly, Dr. Hamburg was well within bounds to rely on these sources in forming his opinions. And Monsanto fails to cite any case that would suggest a differential etiology cannot be used in cases where there are also unknown causes of a disease. In fact, this Court directly addressed and rejected Monsanto's idiopathic argument when "the exposure for [sic] plaintiffs was so significant that their NHL should not be considered idiopathic." See In re Roundup Products Liability Litigation, 358 F. Supp.3d 956, 961 (N.D. Cal. 2019).

Pursuant to PTO 85, plaintiffs must present at least one admissible expert opinion to support their contention that Roundup was the specific cause of their NHL. Because Dr. Hamburg's opinion is admissible, summary judgment should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court deny Monsanto's Motion to Exclude Testimony of Dr. Solomon Hamburg, M.D., Ph.D.

DATED: October 1, 2024          Respectfully submitted,

/s/ *Jeffrey L. Haberman*

Jeffrey L. Haberman (*pro hac vice*)
Jonathan R. Gdanski (*pro hac vice*)
Scott P. Schlesinger (*pro hac vice*)
jhaberman@schlesingerlaw.com
jonathan@schlesingerlaw.com
scott@schlesingerlaw.com
**SCHLESINGER LAW OFFICES, P.A.**
1212 Southeast Third Avenue
Ft. Lauderdale, FL 33316
Tel: (954) 467-8800
Fax: (954) 320-9509

*Attorneys for Plaintiffs*